The STATE of Ohio, Appellant,

v.

PASCHAL, Appellee.

[Cite as *State v. Paschal,* 169 Ohio App.3d 200, 2006-Ohio-5331.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 87433.

Decided Oct. 12, 2006.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Joanna Whinery and Matthew E. Meyer, Assistant Prosecuting Attorneys, for appellant.

Robert L. Tobik, Cuyahoga County Public Defender, and Robert M. Ingersoll, Assistant Public Defender, for appellee.

COLLEEN CONWAY COONEY, Judge.

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals the trial court's decision granting the motion to suppress filed by defendant-appellee, Willie Paschal. Finding no merit to the appeal, we affirm.

{¶ 2} In 2005, Paschal was charged with drug possession. He moved to suppress the evidence found in his vehicle. The following evidence was presented at the suppression hearing.

{¶ 3} Officer Robles was patrolling the area of West 85th Street and Lorain Avenue because he had received numerous drug complaints in that area. At around 9:00 p.m., he observed two men sitting in a car parked in front of a boarded-up house that had been recently raided by police. He observed the men leaning together as if they were looking at something between them. Robles testified that he did not find this suspicious, but rather, he found it "odd." He also found it odd that when he pulled his police cruiser alongside the parked car, the men looked at him in surprise and said, "How are you doing, officer?" Although he had had the opportunity to speak to the men, Robles testified that he did not. Instead, he pulled his cruiser into a driveway to turn around.

{¶ 4} Robles testified that he wanted to get the license plate number from the car and to observe what the occupants were doing. However, when he pulled into the driveway, he looked back and saw the passenger "jump out of the car" and run up the driveway toward the boarded-up house. Robles testified that as soon as the passenger exited the car, the driver, later identified as Paschal, "sped away." At that time, Robles decided to pursue Paschal because he believed he had just interrupted a drug transaction. By the time he turned the police cruiser around and caught up with Paschal's vehicle, Paschal had already traveled "a good quarter mile." Although Robles testified that Paschal was exceeding the speed limit, Robles was not "running radar," nor did he cite Paschal for any traffic violation.

{¶ 5} After Robles stopped Paschal, he approached the car and asked him what he was doing back there and the identity of his passenger. Paschal was unable to give any coherent answer; instead, he "hemmed and hawed." Robles asked Paschal to step out of the car, and then Robles observed in plain view a rock of crack cocaine on the floorboard of the car.

{¶ 6} Following the hearing, the trial court granted Paschal's motion, finding that the Terry stop was based on the officer's hunch and not on any reasonable and articulable facts. See *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 7} The state appeals, arguing in its sole assignment of error that the trial court erred in granting Paschal's motion to suppress because the officer had reasonable suspicion of criminal activity based on specific and articulable facts.

{¶ 8} At a hearing on a motion to suppress, the trial court functions as the trier of fact, because the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of the witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972. On review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Harris* (1994), 98 Ohio App.3d 543, 546, 649 N.E.2d 7. After accepting those factual findings, the reviewing court must independently determine as a matter of law whether the applicable legal standard has been satisfied. *State v. Lloyd* (1998), 126 Ohio App.3d 95, 709 N.E.2d 913.

{¶ 9} In the seminal case of *Terry v. Ohio*, 392 U.S. at 9, 88 S.Ct. 1868, 20 L.Ed.2d 889, the United States Supreme Court explained that the Fourth Amendment allows a police officer to stop and detain an individual if the officer possesses a reasonable suspicion, based upon specific and articulable facts, that criminal activity "may be afoot." See, also, *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271. A valid investigative stop must be based upon more than an inchoate and unparticularized suspicion or hunch that criminal activity is afoot. *United States v. Arvizu* (2002), 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 10} In deciding whether reasonable suspicion exists, courts must examine the " 'totality of the circumstances' of each case to [determine] whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744, 151 L.Ed.2d 740, quoting *United States v. Cortez* (1981), 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621; *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus, citing *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044.

{¶ 11} Under this totality-of-the-circumstances approach, police officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744, 151 L.Ed.2d 740, quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690, 66 L.Ed.2d 621. Thus, a court reviewing the officer's reasonable-suspicion determination must give due weight to the officer's trained eye and experience and view the evidence through the eyes of those in law enforcement. Id. See, also, *Andrews*, 57 Ohio St.3d at 87–88, 565 N.E.2d 1271.

{¶ 12} The state argues that Paschal's driving away after his passenger jumped out of his vehicle constituted unprovoked flight. It further argues that these actions, coupled with the fact that the men were parked in front of a house that had been recently raided for drugs, created reasonable suspicion justifying Officer Robles's investigative stop.

{¶ 13} In support of its arguments, the state cites *Illinois v. Wardlow* (2000), 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570, in which the United States Supreme Court held that presence in a high crime area, coupled with unprovoked flight at the sight of a police officer, constitutes reasonable suspicion to justify a stop.

> Such a holding is entirely consistent with our decision in *Florida v. Royer* [(1983) 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229], where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Id. at 498, 103 S.Ct. 1319, 75 L.Ed.2d 229. And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."

{¶ 14} The state also directs us to *State v. Jordan*, 104 Ohio St.3d 21, 2004–Ohio–6085, 817 N.E.2d 864, in which the Ohio Supreme Court, relying on *Wardlow*, held that unprovoked flight upon seeing police officers is a relevant consideration in determining whether the facts and circumstances are sufficiently suspicious to justify a *Terry* stop.

{¶ 15} However, we find both *Wardlow* and *Jordan* distinguishable because in both of those cases, the unprovoked flight occurred immediately after seeing the police. In *Wardlow*, eight officers in a four-car caravan were patrolling a heavy drug-trafficking area to investigate drug transactions. They anticipated encountering a large number of people, including drug customers and individuals serving as lookouts. Two of the officers observed Wardlow standing next to a building. Wardlow looked in the officers' direction and immediately fled on foot. He was found with a handgun and ammunition.

{¶ 16} In *Jordan*, a uniformed officer was responding to an anonymous tip that drug activity was occurring at a particular house. When he arrived in a marked police vehicle, Jordan, who was seated on the porch, shouted something, and his

male companion immediately fled the scene on foot. A crack pipe was found in Jordan's pocket.

{¶ 17} In both of those cases, the courts held that the immediate flight, coupled with the circumstances surrounding each case, gave the officers reasonable suspicion to justify a *Terry* stop. However, immediate flight is not present in the instant case.

{¶ 18} In the instant case, Robles testified that when he pulled his cruiser beside Paschal's car, both men looked over at him and said, "How are you doing, officer?" Although he found this "odd," he stated that he did not find this suspicious. Robles did not activate his cruiser's overhead lights or issue an order to the occupants of the vehicle, although he testified that he could have done so. Instead, he pulled in a driveway to turn around. It was then that the passenger exited the vehicle and that Paschal drove away. To constitute unprovoked flight, Paschal would have had to immediately speed away when Officer Robles pulled beside Paschal's car.

{¶ 19} The state suggests that instead of driving off, Paschal "could have simply stayed put, and gone about his business." However, it is possible that Paschal was going about his business when he drove off. Paschal had no reason to believe that he was not free to leave. Robles admitted that Paschal was free to leave the area. Robles did not activate his lights or order Paschal to remain at the scene. Instead, Robles pulled in a driveway to turn around.

{¶ 20} Although we find this to be a close case, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Harris*, 98 Ohio App.3d 543, 649 N.E.2d 7. The trial court found that Officer Robles effectuated the *Terry* stop on a hunch. Competent and credible evidence exists to support the trial court's findings. Officer Robles testified that he did not know what the occupants of the car were doing but found their behavior of leaning together "odd." He stated that he believed he had interrupted a drug transaction, which was why he pursued Paschal.

{¶ 21} Therefore, we hold that the court's decision regarding the *Terry* stop is supported by competent, credible evidence, and we thus affirm the court's decision. We also point out that the deference granted the trial court in its findings of fact is important and should be adhered to, especially in cases that are a very close call. In addition, "when we weigh the court's legal determinations, 'we will indulge all reasonable presumptions consistent with the record in favor of [the] lower court.'" *State v. Coppock* (1995), 103 Ohio App.3d 405, 411, 659 N.E.2d 837, quoting *Fletcher v. Fletcher* (1994), 68 Ohio St.3d 464, 468, 628 N.E.2d 1343.

{¶ 22} Accordingly, the assignment of error is overruled.

Judgment affirmed.

CELEBREZZE JR., P.J., concurs.

CORRIGAN, J., dissents.

CORRIGAN, Judge, dissenting.

{¶ 23} I respectfully dissent because I believe that consistent with *Illinois v. Wardlow* (2000), 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570, the police officer had a reasonable suspicion that criminal activity might be occurring based on the flight of one of the occupants of the car.

{¶ 24} The majority's attempt to distinguish *Wardlow* on the basis that the flight did not occur "immediately" after seeing the officer is both legally and factually incorrect. Nowhere in *Wardlow* does the Supreme Court speak of a temporal nexus between the sighting of a police officer and a person's flight from the officer. As in all *Terry* cases, the unique facts and circumstances of each situation dictate whether an officer's suspicion is objectively reasonable. The mechanistic time restraints that the majority uses in attempting to distinguish *Wardlow* are inconsistent with the totality-of-the-circumstances approach used in these kinds of cases.

{¶ 25} In any event, the undisputed facts show that immediate flight did occur. The officer testified that "seconds" had elapsed from the time he pulled up to Paschal's car and the time Paschal's passenger "took off." This amounted to the time it took to pull into the next driveway and turn around. Even under the majority's tortured reading of *Wardlow*, this lapse of time was immediate enough to arouse suspicion and justify a *Terry* stop.

{¶ 26} The majority questions whether the officer was "suspicious," quoting him as saying that he merely found the situation odd. This is an incomplete view of the record. Defense counsel asked the officer, "[D]id you find it suspicious that they were looking at something and sort of huddled together in the middle of the car? Did you find that suspicious?" The officer answered, "That drew my attention to them." The officer testified that he suspected that a drug transaction had been occurring and pulled his car around to get a better look at the license plate.

{¶ 27} Obviously, the officer thought that two men, huddled together in a car in front of a boarded-up drug house, were suspicious enough to warrant a record check. When Paschal's passenger took off running just seconds after seeing the officer, a *Terry* stop was justified.