JOURNAL ENTRY AND OPINION
{¶ 1} The state of Ohio appeals from an order suppressing evidence seized during a traffic stop of defendant Adam Raphael. The court suppressed the evidence because the state did not articulate a reasonable suspicion to investigate whether a crime occurred.
 I {¶ 2} The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." The amendment has been extended to seizures of passengers in traffic stops under the rationale that the amendment "protects people, not places." Katz v. United States
(1967), 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576. Using the reasonableness requirement of the amendment, the United States Supreme Court has held that a seizure must be reasonable both at its inception and throughout its duration. See Terry v.Ohio (1968), 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889. A traffic stop is considered to be "analogous" to a Terry stop.Berkemer v. McCarty (1984), 468 U.S. 420, 439, 104 S.Ct. 3138,82 L.Ed.2d 317. Thus, in order to effect a valid traffic stop, the police need only have a reasonable suspicion that some illegality has occurred or is occurring in order to stop a vehicle to investigate. Id. The basis for this suspicion, however, must be clearly articulable. Terry, 392 U.S. at 21
("In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.").
 II {¶ 3} The court's factual findings are uncontested by the state. Accepting those facts as true, we then independently determine whether the trial court's decision met the applicable legal standard. State v. Santini, 144 Ohio App.3d 396, 406,2001-Ohio-3313, 760 N.E.2d 442.
 {¶ 4} Two police officers were patrolling during daylight hours in an area that both of the officers agreed was not a high crime area. Although they each had at least five years of service with the city of Cleveland Police Department, they had made only 20 arrests between them. As they patrolled, they saw Raphael parked in the parking lot of a city park. Although they agreed he had been doing nothing illegal, one of the officers thought the circumstances were unusual because "we seen [sic.] a white male sitting in the park that's a predominantly black neighborhood." One of the officers also testified that "[u]sually in that zone we basically know who's around the area. So we see somebody that we haven't seen before, that's gonna raise suspicion to us." They decided to circle back and check on him. When they returned, Raphael had left the lot. Thinking that "maybe he was waiting on possible drugs," the officers tried to find Raphael. Five minutes later, they saw Raphael's car parked behind a service station in an area reserved for employees. They noticed that Raphael had parked his car perpendicular to the parking space lines. They moved to a covert position some 50 feet away and watched Raphael for about six minutes. At that point, a male approached Raphael's car on foot, leaned into the car with both hands extended and his palm open. Neither of the officers saw anything in the male's hands, nor did they witness any exchange of goods or money. As they "inched" closer for a better look, the male noticed them and "slowly walked away and ran across the street * * *." Deciding it imprudent to chase this male across traffic, the officers focused their attention on Raphael "since this is our second time encountering him." Raphael started to drive away, and the officers followed. They ran a record check on Raphael's plates, but found no outstanding warrants. Despite this, they concluded, "we gonna investigate this male, see what's going on." They decided to conduct a "traffic stop."
 {¶ 5} In answer to the specific question of why they stopped Raphael, one of the officers said, "Suspicious behavior. We see a male running from his vehicle, I don't know if he just robbed him or what the case might have been." The officers agreed that Raphael had not broken any traffic laws, nor were they of a mind to cite him for the way he parked at the service station. As one of the officers put it, "[s]ince we had seen him on the second occasion, yes, we wanted to investigate what was going on."
 {¶ 6} The court made the following conclusions:
 {¶ 7} "On cross-examination, Officer Walker admits there was no other reason to stop you, other than to see that this activity took place. Of course as I mentioned earlier, there were no complaints of drug activity or illegal activity at the gas station.
 {¶ 8} "We also heard from Officer McMullen that it is not a high crime area. He couldn't articulate any suspicious behavior. It was his testimony that Officer Walker only had a view of what was going on and he didn't see the transaction.
 {¶ 9} "I can envision very little debate that one incident of a black male leaning into a car window of a car parked in the back of a parking lot is something that rises to a level of suspicious activity. In this case we have one incident of that happening with his arms and his hands out in an area without complaint of drug activity.
 {¶ 10} "It is arguably a nice neighborhood and the officers — and we have officers who are suspicious of cars illegally [sic.] parked in public parks and individuals that they have not seen in the neighborhood.
 {¶ 11} "Therefore, a total analysis of the circumstances set forth in this case leads the Court to but one conclusion, that the officers did not articulate a reasonable suspicion to investigate whether a crime had occurred. * * *"
 III {¶ 12} It bears noting that the Supreme Court observed inTerry that temporary investigative stops must rest on more than a "inchoate and unparticularized suspicion, [i.e.,] a hunch."Terry, 392 U.S. at 27. Indeed, by its very nature, a "hunch" is inarticulable because it is intuitive.
 {¶ 13} As the court found, the arresting officers articulated no reasons to justify the traffic stop. They agreed that Raphael had been lawfully parked at the city park. They agreed that they had no reason to issue a citation for the way he parked at the service station. They agreed that they did not see any evidence of an illicit transaction at the service station. Finally, they agreed that Raphael did not break any traffic laws as he drove away from the service station.
 {¶ 14} The only fact arguably supporting an investigative stop was the male's running away upon seeing the officers. InIllinois v. Wardlow (2000), 528 U.S. 119, 120 S.Ct. 673,145 L.Ed.2d 570, the United States Supreme Court held that presence in a high crime area, coupled with unprovoked flight at the sight of a police officer, constitutes reasonable suspicion to justify a stop. The court held:
 {¶ 15} "Such a holding is entirely consistent with our decision in Florida v. Royer, where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any `refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not `going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." Id. at 125 (citations omitted).
 {¶ 16} This court recently considered this law in State v.Paschal, Cuyahoga App. No. 87433, 2006-Ohio-5331. In Paschal,
the majority construed Wardlow to find that in order to be suspicious, flight must occur "immediately after seeing the police." Id. at ¶ 15. This was a debatable conclusion, but of no moment in this case. While Raphael did drive away as soon as the male left the vehicle, the officers did not find this suspicious:
 {¶ 17} "Q. He was just driving away; correct?
 {¶ 18} "A. Yes.
 {¶ 19} "Q. Now that's not suspicious or illegal, correct?
 {¶ 20} "A. That's correct."
 {¶ 21} In Wardlow, the flight itself caused the police to become suspicious. Here, the officers agreed that Raphael's decision to drive away did not arouse suspicion. In short, there was no evidence to show that the officers had an objectively reasonable belief that Raphael had committed any crime. Instead, they relied on hunches and guesswork, none of which passed muster under Terry. The court did not err by granting Raphael's motion to suppress.
 {¶ 22} Judgment affirmed.
 {¶ 23} It is ordered that appellee recover of appellant his costs herein taxed.
 {¶ 24} The court finds there were reasonable grounds for this appeal.
 {¶ 25} It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
 {¶ 26} A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, P.J., and McMonagle, J., concur.